UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RONALD CASSIDY,

        Petitioner,

**DECISION AND ORDER**
**No. 06-CV-06310**

-vs-

THOMAS POOLE, SUPERINTENDENT,
FIVE POINTS CORRECTIONAL FACILITY

        Respondent.

_____

## I. Introduction

Petitioner, Ronald Cassidy ("Petitioner"), through counsel, has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment of conviction entered June 24, 2003, in New York State, County Court, Wayne County, convicting him, after a jury trial, of two counts of Sexual Abuse in the First Degree (N.Y. Penal Law ("Penal Law") § 130.65[3]) and Three Counts of Endangering the Welfare of a Child (Penal Law § 260.10[1]).

For the reasons stated below, the writ is denied and the petition is dismissed.

## II. Factual Background and Procedural History

### A. Introduction

In 2002, Petitioner was arrested for displaying his penis and engaging in sexual acts and/or watching a pornographic video with his fiancee's ten-year old daughter and her friends in Petitioner's

home in Newark, New York. These activities occurred over a two-year period.

By Wayne County Indictment No. 02-56, Petitioner was charged with three counts of Sexual Conduct Against a Child in the First Degree (Penal Law § 130.75[1][a]), two counts of Sexual Abuse in the First Degree (Penal Law § 130.65[3]), and five counts of Endangering the Welfare of a Child in the First Degree (Penal Law § 130.65[3]).

**B. Pre-Trial and Trial**

Before trial, Petitioner moved to sever the counts of the indictment as they related to each incident. The trial court denied Petitioner's motion, finding that joinder for trial of all counts of the indictment was statutorily proper. Motion Minutes [M.M.] 5-6.

**1. The People's Case at Trial**

In April 2002, the complainant[1] ("the primary complainant"), lived at 1371 Aracadia Zurich Norris Road ("the premises" or "Petitioner's home"), in Newark, New York with her mother, Petitioner, and Petitioner's son from another marriage. T.T. 737.

With regard to counts 1-3 of the indictment, the primary complainant testified to the following: that between about December 1, 2001 and April 1, 2002 she performed oral sex on Petitioner; that Petitioner inserted his penis into her vagina

---

[1] The names (and other identifying information) of each of the minor complainants are withheld from this Decision and Order.

-2-

more than two times; and that Petitioner inserted a sex toy into her vagina. T.T. 760. The primary complainant also testified to the following: that between about January 1, 2001 and November 30, 2001 she performed oral sex on Petitioner; that between about January 1, 2000 and December 31, 2000 Petitioner inserted his penis into her "bottom", and that she performed oral sex on Petitioner. T.T. 763.

Before April 5, 2002, the primary complainant had not reported the abuse to her mother because Petitioner threatened to harm her, and she was scared.[2]  T.T. 752-753.

The primary complainant's mother testified that after her daughter spoke to her on April 5, 2002, she took her daughter to her pediatrician to be examined. T.T. 1312-1314. On that same date, the primary complainant's mother gathered sex toys and pornographic videotapes from the premises, and turned them over to police. T.T. 1325-1330.

Dr. Michael Robert Jordan ("Dr. Jordan"), the primary complainant's pediatrician, testified, as an expert witness, that he had performed physicals on the primary complainant prior to April 5, 2002 and had never noticed any abnormalities with respect to the primary complainant's vagina or anus. T.T. 989-990.

---

    2    The primary complainant testified that Petitioner threatened to "stick his penis down [her] throat or [sic] drown her." T.T. 753.

Dr. Jordan testified that when he examined the primary complainant on April 5, 2002, her hymen looked abnormal.[3]  T.T. 975-977.

With regard to counts 4 and 5 of the indictment, one of the primary complainant's friends ("complainant #2") testified that on the afternoon of September 20, 2001, she was at the premises while the primary complainant's mother was out.  T.T. 1480-87.  In Petitioner's bedroom, Petitioner told the primary complainant and complainant #2 to rub his penis, which both did.  T.T. 1486.  A pornographic videotape was playing on the television in Petitioner's bedroom while the complainants rubbed Petitioner's penis.  T.T. 1486.  The primary complainant corroborated complainant #2's testimony.  T.T. 736, 765-68.

With regard to counts 6-8 of the indictment, another of the primary complainant's friends ("complainant #3") testified that she came over to the premises around Christmas 2001.  She testified that while both she and the primary complainant were in the living room, Petitioner entered wearing a bathrobe and laid down on the couch.  The primary complainant removed Petitioner's bathrobe and rubbed his penis.  T.T. 1588-1589.  The primary complainant instructed complainant #3 to touch Petitioner's penis, which she did.  T.T. 1591.  On New Year's Eve 2001, complainant #3 slept over at the Petitioner's home.  T.T. 1593.  The following day, while the

---

[3]  Dr. Jordan testified that there was a loss of tissue on both sides of the primary complainant's vagina, a thickening of the central portion of the hymen, and that her anus dilated and stayed open for approximately five to ten seconds before closing.  Based on these findings, Jordan concluded that the primary complainant had been vaginally and anally penetrated.  T.T. 977-78, 981, 978-79, 1007-1010.

-4-

primary complainant's mother was cooking dinner downstairs, the primary complainant and complainant #3 entered Petitioner's bedroom. The primary complainant used a sex toy on Petitioner's penis. T.T. 1595. The primary complainant corroborated complainant #3's account of the sleep-over, but testified that complainant #3 used the sex toy on Petitioner, not her. T.T. 776. At some point later in January 2002, complainant #3 returned to the premises. T.T. 779, 1596. Complainant #3 testified that she did not remember anything unusual happening during this visit, but the primary complainant recalled that she rubbed Petitioner's penis in front of complainant #3 during that visit. T.T. 779.

With regard to count 9 of the indictment, another of the primary complainant's friends ("complainant #4") testified that in May 2001, she came over to the premises while the primary complainant's mother was not home. T.T. 1392. During her visit, Petitioner played a pornographic videotape in her presence. T.T. 1390-91. During cross-examination of the primary complainant, the primary complainant testified that to the extent that complainant #4 watched a pornographic tape in May of 2001, she was a liar who made up the story because she was best friends with complainant #2. T.T. 834-35.

With regard to count 10 of the indictment, another friend of the primary complainant ("complainant #5") testified that in February 2002, she came over to the premises. T.T. 1440. She testified that when the primary complainant asked Petitioner for

help with a *Play Station* game, he appeared in a robe, sat on a chair with his robe spread, and that she could see Petitioner's penis. T.T. 1445. Petitioner then laid on the primary complainant's bed with his legs spread open such that complainant #5 could see Petitioner's penis. T.T. 1446. Complainant #5 was unable to identify Petitioner at trial. T.T. 1440-1441. The primary complainant corroborated complainant #5's testimony. T.T. 784-85.

### 2. Petitioner's Case

Dr. Lawrence Rosenberg ("Dr. Rosenberg"), a board certified pediatrician, testified as an expert witness. Dr. Rosenberg testified that if a child's anus had been subjected to repeated anal penetration, there would not only be the possibility of anal dilation, but that there would be other indicia as well. T.T. 1689. He concluded, based on his review of pictures of the primary complainant's anus taken by Dr. Jordan, that the primary complainant's anus did not have the characteristics of being repeatedly and chronically abused. T.T. 1692-94. Dr. Rosenberg testified that the primary complainant's hymenal tissue on the anterior side of the vaginal opening was normal, and that there was no evidence that she had been repeatedly vaginally penetrated. T.T. 1715-16. However, Dr. Rosenberg also testified that slight vaginal or anal penetration several times a year could or could not result in changes to the vagina or anus, so that he was unable to

tell whether the primary complainant had been vaginally or anally penetrated. T.T. 1735.

Petitioner testified that his relationship with the primary complainant's mother ended in February 2002, but he allowed both her and her daughter to remain in the premises until the primary complainant's mother found a different place to live. T.T. 1803. He testified that he and the primary complainant did not get along, and that she frequently acted out. T.T. 1799. Petitioner acknowledged that the pornographic videos were his, but denied the allegations of sexual misconduct against him. T.T. 1794-96, 1811, 1819-1825, 1833-34.

### 3. Verdict and Sentencing

On April 26, 2003, the jury found Petitioner guilty of counts 4-7 and 9 and not guilty of counts 1-3 and 10.[4] He was sentenced to an aggregate term of imprisonment of fourteen years. Sentencing Minutes [S.M. 22].

### 4. Direct Appeal

Petitioner appealed his judgment of conviction, which was unanimously affirmed by the Appellate Division, Fourth Department on March 18, 2005. People v. Cassidy, 16 A.D.3d 1079 (4th Dep't. 2005). Leave to appeal was denied by the New York Court of Appeals on July 8, 2003. People v. Cassidy, 5 N.Y.3d 760 (2005).

---

[4] At the conclusion of the presentation of the evidence, the trial court dismissed count 8, which alleged that Petitioner endangered complainant #3's welfare by exposing his penis to her. T.T. 1856.

**D. The Habeas Corpus Petition**

Petitioner seeks habeas corpus relief on the ground that the trial court improperly denied his motion for severance. This claim is exhausted and properly before the Court. See 28 U.S.C. § 2254(b)(1)(A).

**III. General Principles Applicable to Habeas Review**

**A. The AEDPA Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a claim that was "adjudicated on the merits" in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant

state-court decision.  Williams, 529 U.S. at 412; accord Sevencan v. Herbert, 342 F.3d 69, 73-74 (2d Cir. 2002), cert. denied, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case.  Williams, 529 U.S. at 413; see also id. at 408-10.  "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently."  Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001).  Rather, "[t]he state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable."  Id.  This increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence."  Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct.  The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), cert. denied sub nom. Parsad v. Fischer, 540 U.S. 1091 (2003).  A state

court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

**B.   Exhaustion Requirement**

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999); accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir.1994), cert. denied, 514 U.S. 1054 (1995). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*), cert. denied, 464 U.S. 1048 (1984).

**IV. Petitioner's Claim**

Petitioner argues that the state court's denial of his pre-trial motion to sever the counts of the indictment deprived him of his constitutional right to a fair trial. Petition [Pet.] ¶12. More specifically, he contends that the jury convicted him "purely because collectively the number of charges and the number of victims made it difficult to believe in his total innocence." Pet.

¶12, Page 15. Petitioner raised this claim on direct appeal, and it was rejected on the merits.[5]

"Joinder of offenses rises to the level of a constitutional violation only if it 'actually render[s] petitioner's state trial fundamentally unfair and hence, violative of due process.'" Herring v. Meachum, 11 F.3d 374, 377 (2d Cir. 1993) (quoting Tribbitt v. Wainwright, 540 F.2d 840, 841 (5th Cir. 1976), cert. denied, 430 U.S. 910 (1977)), cert. denied, 511 U.S. 1059 (1994). The Second Circuit has recognized that "there is . . . always a danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all." Herring, 11 F.3d at 377. Nevertheless, "joinder of offenses has long been recognized as a constitutionally acceptable accommodation of the defendant's right to a fair trial," id., and, thus, whenever a defendant claims a due process violation based upon joinder of offenses, "he must, to succeed, go beyond the potential for prejudice and prove that actual prejudice resulted from the events as they unfolded during the joint trial." Id. at 377-78.

---

[5] The Appellate Division, Fourth Department held: "[w]e also reject the further contention of defendant that the court improperly denied his motion to sever the counts of the indictment. The offenses all involved the same or similar statutory provisions, and involved incidents in which proof as to one count would be admissible and relevant as to others. The offenses therefore were properly joined, and defendant failed to meet his burden of submitting sufficient evidence of prejudice from the joinder to establish good cause to sever." People v. Cassidy, 16 A.D.3d at 1081 (citations omitted).

-11-

In this case, Petitioner cannot make out the requisite showing that joinder of the counts resulted in actual prejudice. He contends that each of the individual counts he was convicted of were plagued by "fatal proof problems" such that had they been tried separately, he would have been acquitted. Pet. ¶12, Page 19. The Court finds this contention both speculative and unconvincing given that the trial court provided the jury with instructions to prevent it from cumulatively evaluating the evidence, and that the jury ultimately rendered a verdict that tends to show it took the instructions into consideration.

At Petitioner's trial, the judge instructed the jury that the evidence of one count was not to be used to determine Petitioner's guilt as to the other counts:

> You have observed that the people have joined in this single indictment several counts, each charging a separate crime. These crimes are joined in a single indictment solely for the convenience of the Court. Ordinarily, the fact that a defendant is charged with one crime constitutes no proof that he committed another crime also charged in a single indictment. Therefore, unless the Court specifically instructs you otherwise, you are required to separate in your mind the evidence applicable solely to each crime and to return a verdict on each crime based solely upon the evidence applicable to that crime.

T.T. 1971-1972. Thus, the jury was properly instructed to refrain from viewing the evidence of the crimes cumulatively during deliberations. See Herring, 11 F.3d at 378; Zafiro, 506 U.S. at 540-541. This Court must presume that the jury followed these

instructions "unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." See Herring, 11 F.3d at 378 (quoting Greer v. Miller, 483 U.S. 756, 766 n.8 (1987)) (internal quotations omitted). Petitioner offers no reason to believe that the jury did not follow the trial court's instructions, and no such "overwhelming probability" of confusion is discernible on the record. See id. Based on his conviction of some counts of the indictment and acquittal of others, the jury carefully followed the trial court's instructions to consider each count separately and weigh the evidence accordingly. See id.; see also Davis v. Kelly, 2 F.Supp.2d 362, 366 (W.D.N.Y. 1998). Therefore, Petitioner has failed to show that the "spillover" effect allegedly caused by the joinder, if any, rose to the level of a constitutional violation which would warrant habeas relief.

Accordingly, the Court finds that the determination of the state court to refuse severance was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent on this issue, and Petitioner is not entitled to habeas relief on this ground.

## V. Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because Petitioner has failed to make "a substantial

showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), I decline to issue a certificate of appealability. See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000). The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person. Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    December 17, 2009
          Rochester, New York